38 C.C.P.A.(Patents)

## RANNEY v. BRIDGES.

Patent Appeals No. 5733.

United States Court of Customs and
Patent Appeals.

Jan. 16, 1951.

Supplemental Opinion April 10, 1951.

Motion to Suspend Further Proceedings,
etc., Denied May 10, 1951.

Bates, Teare & McBean, Cleveland, Ohio (Albert R. Teare, Cleveland, Ohio, and Donald A. Gardiner, Washington, D. C., of counsel), for appellant.

John Howard Joynt, Washington, D. C., for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office, awarding priority to the party Bridges, in an interference proceeding between patentees, involving three counts which relate to a fluorescent tube lighting system, as illustrated by count 1, which reads: "1. A fluorescent tube lighting system, comprising a high leakage reactance transformer having a primary winding and two secondary windings mounted on a common core, a fluorescent gas discharge tube connected in circuit with one of said secondary windings, a second fluorescent gas discharge tube connected in circuit with the other of said secondary windings, shunt core means magnetically between the primary winding and one only of said secondary windings to limit the current in said winding, and a condenser in circuit with said other of said secondary windings and the tube connected thereto to limit the current in that winding to substantially that of the first-mentioned secondary winding."

We take the following from the decision of the board: "This interference concerns a system of energizing two fluorescent discharge tubes by a transformer having one secondary winding for each tube; one secondary circuit controlled by a magnetic shunt in the transformer and the other secondary closely coupled to the primary and having the current limited in its circuit to substantially that in the other secondary winding by a condenser in series with the secondary winding and tube. The condenser thereby serves the dual purpose of current regulator and power factor corrector."

The following explanatory matter is taken from the brief on behalf of Bridges:

"The essential elements of the system and apparatus here involved, as noted in the count cited, comprises 'a high leakage reactance transformer having a primary winding and two secondary windings mounted on a common core'. Also, 'a fluorescent gas discharge tube connected in circuit with one of said secondary windings'. Additionally, 'a second fluorescent gas discharge tube connected in circuit with the other of said secondary windings'. Moreover, it comprises 'shunt core means magnetically between the primary and one only of said secondary windings'. And finally, 'a condenser in circuit with said other of said secondary windings * * * to limit the current in that winding to substantially that of the first-mentioned secondary winding'."

On August 1, 1944, a patent, No. 2,354,-879, was issued to the party Ranney upon an application filed March 20, 1942, and on March 6, 1945, another, No. 2,370,635, was issued to the party Bridges upon an application filed June 25, 1942.

On June 22, 1945, a few days more than three months after the patent to Bridges issued, Ranney filed application, serial No. 600,893, for the reissue of his patent 2,354,-879, copying into it three claims, which became the counts at issue.

The record discloses that appellant Ranney copied some claims from the Bridges patent which was assigned to Boucher Inventions, Limited, and some from a patent granted to C. P. Boucher and F. A. Kuhl (hereinafter referred to as the Boucher-Kuhl patent) March 6, 1945, on an application filed October 21, 1941, which also was assigned to Boucher Inventions, Limited. Two interferences were declared—one, No. 82,182, between Bridges and Ranney, and the other, No. 82,183, between Boucher-Kuhl and Ranney. Motions to dissolve were made on behalf of Bridges and on behalf of Boucher-Kuhl as a result of the decision of which only three counts were set up and there being a common assignee of the Bridges and Boucher-Kuhl patents, Patent Office Rule 78 (old Rule 43), 35 U.S. C.A.Appendix, was applied, and all three counts are included in Interference No. 82,182. The situation so described is al-

luded to in the decision of the board. No question of Bridges' right to make the counts was raised before the board, nor was any question raised as to the applicability of Patent Office Rule 78, and we have no issue concerning those questions before us.

■ Since the original applications of the respective parties were copending, two patents for substantially the same subject matter were inadvertently issued, and the junior party, Bridges, has the burden of establishing his case by a preponderance of the evidence.

Priority in fact, with no ancillary questions, is the sole ultimate issue before us.

The board awarded Bridges actual reduction to practice as of May 22, 1941, which was prior to Ranney's entry into the field.

It may be said that the patent to Bridges stands assigned to Boucher Inventions, Limited, a patent-holding corporation of Delaware, which was closely connected with National Inventions Corporation, another patent-holding corporation of Delaware. Both were intimately associated with National Transformer Corporation, a manufacturing corporation of Delaware, which apparently succeeded a similarly named corporation of New Jersey.

One of the witnesses called on behalf of Bridges, Lovell G. Mickles (age not stated), a resident of Montreal, Canada, at the time of testifying, seems to have been President and General Manager of all three corporations. The board stated in its decision, "Boucher and National were closely connected, and for the purpose of this case it is not necessary to make a distinction." This statement is quite correct and we have mentioned the organizations merely to furnish a background relative to the relationship of the witnesses for Bridges to the real party in interest—National Transformer Corporation, which hereinafter is referred to usually as National.

Bridges himself (age 50 at the time he testified) is described by Noble as a sales engineer for National. He, as found by the board, "was interested in having National produce a transformer that could be sold to fixture manufacturers for use in fixtures for hot cathode lamps."

In addition to the testimony of Bridges and Mickles there was taken the testimony of (ages of witnesses stated as of time the testimony was taken) Bertrand H. H. Noble (age 58); Russell W. Keiser (age 44); William H. Skeels (age 48); Frederick A. Kuhl (age 32); and, as a rebuttal witness, William K. Feiler (age 43). All the witnesses, except Feiler, testified in May 1947. His testimony in rebuttal was given September 29, 1947.

It appears that a Mr. C. P. Boucher of Boucher Inventions, Limited, often referred to in the record in connection with the Bridges development and other activities, who was himself an inventor and who was employed by National as its Chief Engineer for many years, died about a year before the taking of testimony in the case began in May 1947, and his testimony was not taken.

Noble, who was the Vice President of the National Transformer Corporation, testified that his duties "included everything, with the exception of inventing." "More specifically," he said, "I had complete charge of the operation to get production, to get sales, arrange financing." He served the company "For the period of about 1938 until December 31, 1941." He had no connection with the corporation at the time he testified in May 1947, nor at any time after December 31, 1941.

Keiser (age 44), who stated that he had been active in electrical illumination since about 1934 or 1935 and that he was a joint inventor with Boucher in the illumination field, according to his own testimony, appears to have become associated with National "along in June, 1940," when employed as Sales Manager.

It is not clear just when Keiser's connection with National ceased. It is apparent that he was with it in 1941 and that he was not with it at the time he testified in May 1947.

Skeels (age 48), who appears to have had considerable experience in the electrical illumination art, was employed by Na-

tional from about the first of July 1942 until February 1, 1943, as Plant Superintendent in charge of assembly of ballast and transformer units. So, he was not employed by National at the time of Bridges' activities in May 1941, nor was he so employed at the time he testified.

Kuhl (age 32), who obtained the degree of Bachelor of Science in Industrial Engineering from Lehigh University in 1936, entered the employ of National "around March of 1939" as an electrical engineer, it being his duty, during at least a part of the time, to assist Boucher in building test equipment for and testing transformers. He was coinventor with Boucher of the device of the Boucher-Kuhl patent. He left the employ of National in November 1941, and was not in its employ at the time he testified in May 1947.

The rebuttal witness, Feiler (age 43), was a manufacturer of tools, dies, and metal stampings at his plant located in Hoboken, New Jersey. National, whose transformer manufacturing business was conducted at Paterson, New Jersey, was one of Feiler's customers.

The senior party, Ranney, in his preliminary statement, alleged conception, with explanation to others, "between July 1, 1941 and August 1, 1941" and reduction to practice "on or about" the 1st day of August 1941. Diligence was alleged to have begun "on or about the 15th day of July, 1941."

Bridges alleged conception with disclosure to others in September 1940; construction of units embodying the invention in September or October 1940 and during the winter of 1940; beginning of diligence "in September of 1940" with reduction to practice (1) in September or October 1940; (2) again in the winter of 1940; (3) still again "in the Spring of 1941"; and (4) "at various other times subsequent thereto."

The board awarded Bridges conception in September 1940 and, as hereinbefore stated, reduction to practice as of May 22, 1941, but it held, in effect, that in the event he should be denied reduction to practice on or before May 22, 1941, Ranney must prevail (he being awarded conception on or shortly before August 1, 1941, and reduction to practice "on or prior to October 2, 1941") because, the board held, Bridges failed to establish diligence during the period of Ranney's activity up to the date awarded him (Ranney) for actual reduction to practice. As hereinafter stated, we agree with its finding as to lack of a showing of diligence by Bridges.

Testimony was taken on behalf of both parties and both caused the introduction of many exhibits, documentary and physical. So, the record before us is an elaborate one. However, it contains much matter which in the end proved to be irrelevant, or at least immaterial.

It is obvious that the Bridges record requires first consideration.

As we view the controversy, the outstanding question presented is that of the corroboration of the testimony of Bridges on certain vital points. Such was the view of the board which said, in substance, that in its opinion the weakest point in the case for the test of the Bridges unit No. 3 was in the matter of corroboration of Bridges' testimony relative to certain circuit connections of the apparatus. This we discuss more fully hereinafter.

We shall not recite in detail the widespread activities of Bridges during his early life. He testified that he was engaged in electrical work—particularly in the illumination field—beginning in 1918; that he held no degree in electrical engineering, but had taken correspondence courses in engineering; that one phase of the work he did was with electrical signs, including neon signs; that he worked under various employers and, at times, independently, being himself an employer, in various cities of the United States—New York; Chicago; Montgomery, Alabama; Atlanta, Georgia; Houston, Texas; Miami and other Florida cities among them.

We have no reason to doubt that Bridges had become a practical worker in the electrical-sign field at the time he was employed by Noble late in 1938, "after much correspondence," to become a "sales engineer" for National, nor any reason to doubt his

ability to conceive the invention at issue, make drawings of it and embody it in physical form.

It was his duty after his employment by National to call on neon sign manufacturing plants to demonstrate the principle of double circuit transformers in order to create a market for them.

He claims to have conceived the invention while so engaged, and in a letter written to Noble from Wilmington, North Carolina, in which numerous business matters were discussed, wrote a paragraph, reading: "Am very much interested in our transformers operating the Hot Cathode lamp and only wish we had a unit to sell to Fixture Mfgrs for hot cathode and am enclosing a rough sketch of an idea for Mr. Boucher to give me his opinion—If this will work it will eleminate (sic) the started switch that causes the slow start and burn outs—".

The letter with the sketch attached was introduced in evidence as Bridges' Exhibit 4. Noble testified that he received the letter and sketch and turned the sketch over to National's Chief Engineer, Boucher, who, after arguing for a time that he was too busy to work on a model, was specifically ordered by Noble to make one. According to Noble's testimony, Boucher, who made a copy of the Bridges sketch, proceeded to do so, Noble observing him winding the coils in the laboratory.

During the taking of his testimony Noble referred frequently to notes which he said were made on what he called "a daily calendar" that he kept. He stated that it showed the finishing of a model on September 17, 1940, and testing it on September 20, 1940, at 2:30. He stated that the note made on his calendar on that day read: "Boucher showed test on 'E' lamp. Brilliance not satisfactory, present Boucher, Noble and Kuhl."

Without pursuing the evidence relating to Bridges' conception further, it properly may be stated at this point that the board awarded him conception as of the date in September 1940 on which Noble received from him the letter written from Wilming-ton, North Carolina, dated September 8, 1940, and although this award is vigorously attacked by appellant, we are not convinced that the board erred in so holding.

It is unnecessary to indulge in a prolonged discussion of this phase of the controversy, however, although it properly is stated as a part of the history of the case.

If the award of reduction to practice to Bridges on May 22, 1941, before Ranney even claims to have entered the field, be upheld, priority of conception necessarily goes with the award. On the other hand, if the award to Bridges be not upheld, then Ranney is entitled to prevail, because, in our opinion, it cannot be contended successfully that there is any proof of diligence on the part of Bridges from the time just before Ranney entered the field up to October 2, 1941, the date awarded Ranney for reduction to practice. The board so found on the question of Bridges' diligence, and we agree with such finding.

According to Noble's testimony, Boucher, after the test of Exhibit 1 in September 1940, made up another unit which was introduced in evidence as Bridges' Exhibit 2. This was somewhat smaller than Exhibit 1 and was stated by Noble to have been demonstrated by Boucher November 8, 1940, in the presence of Keiser, Bridges (who seems not to have been present at the test of Exhibit 1), Kuhl, and Noble, who, referring to his notes, stated that the test began at 1:18 and ran until 3:30. He stated that Exhibit 2 showed greater brilliance than Exhibit 1 and greater than the standard ballast of some competing manufacturers—an end which was being sought.

The board, after referring to the testimony of Kuhl, who witnessed the test of Exhibit 2 as well as that of Exhibit 1, said: " * * * But for Noble's contemporary view that unit number 2 could and should be made smaller, and his unwillingness to stamp the experimental work complete at this stage, the counts might be considered reduced to practice by the testing of this unit. However, Noble considered the testing of unit 3 as merely the testing of a final model of unit 2, differing only in size of transformer and of condenser."

The No. 2 unit not being accepted by Noble as satisfactory for manufacture, Bridges personally, according to the testimony of himself and Noble, made a third unit which was introduced in evidence as Bridges' Exhibit 3, and the test of this unit, on May 22, 1941, was held by the board to have been a reduction to practice.

Before entering upon a discussion of that finding of the board, it is proper to consider the allegation made on behalf of the party Ranney that Exhibit 3 was not in existence until 1942, because if that allegation should be found correct it would apparently end the case, since Bridges took no appeal and, hence, is not in position to receive here a more favorable decision than he received from the board.

In the brief for Ranney it is said:

"Aside from the contention that the alleged testing of Exhibit 3 was not sufficiently corroborated to establish a reduction of [sic] practice, we further contend that Exhibit 3 was not in existence at the time of the alleged test. This contention is based upon the testimony concerning the laminations which comprise the magnetic core for Exhibit 3. If the core lamp be removed and a core stack be withdrawn, it will be found that each lamination bears such a close resemblance to all of the others in that stack as to justify the conclusion that a *production* blanking die was used for making the laminations. If that be true, then Exhibit 3 could not have been in existence until a production die was obtained. (Italics quoted.)

"Exhibit 8 was offered by Bridges as an invoice from the Metro Manufacturing Company for a die that would make laminations like Exhibit 3, but the testimony is that the die mentioned thereon was not delivered until March 10, 1942 * * *."

The contention so named has been vigorously pressed before us in substantially the same manner as it was pressed before the board, judging from the latter's decision.

At this point it is proper to state that the witnesses whose testimony was taken on behalf of Ranney were Ranney himself, Homer C. Halladay, J. Kent Thompson, and Emil Olds. Their ages do not appear to

have been stated definitely, but obviously they were mature men at the time of testifying in August 1947.

Ranney was graduated from Case Institute of Technology in 1916, receiving a B. S. degree. In 1918 he became associated with France Manufacturing Company, of Cleveland, Ohio, a maker of electrical apparatus, including gaseous tube transformers, ignition transformers, neon sign flashers, and fluorescent transformers. He worked in various capacities. In 1926 he became President and General Manager of the company to which his patent and the application for its reissue here involved are assigned.

Halladay, at the time of testifying, was Superintendent of Maintenance for a company named The Leece-Neville Company. It was a part of his duty to requisition and install needed lamp fixtures. His testimony does not seem to have any relevancy to the phase of the controversy immediately under discussion—that is, appellant's allegation of the non-existence of Bridges' Exhibit No. 3 in 1941.

The same seems to be true of the testimony of the witness Thompson, sometimes referred to in the record as a "project engineer," who, at the time he testified, was in the employ of Jack & Heintz Precision Industries, Incorporated, of Bedford, Ohio. He was in the employ of the France Manufacturing Company from August or September 1932 until the end of January 1942. As we understand his testimony, his work was in the electrical illumination field.

Olds began work for the France Manufacturing Company in 1925 and was with the company at the time he testified in 1947. From 1938 he was Superintendent (we assume of production), having been advanced to that position from that of Foreman. All transformers were made under his supervision. His testimony relating to the allegation of the non-existence of Bridges' Unit 3 in 1941 is referred to hereinafter.

It should be understood that for the time being we are limiting our consideration to the matter of the existence of Bridges' Exhibit 3, apart from the matter of testing it.

In the brief for Bridges, it is said with reference to the allegation that the exhibit was not in existence until the year 1942: "* * * This charge, of course, means that Bridges is not to be relied upon as a witness. It means that the testimony of Mr. Noble must be viewed with suspicion and held unbelievable. It means that the testimony of Mr. Keiser must be rejected. Likewise, it means that the testimony of Mr. Kuhl, who left National Transformer Corporation in November of 1941, must be discredited. And, it means that the testimony of Mr. Feiler, President of Metro Manufacturing Co., a commercial manufacturer of dies and tools, also must be held unbelievable."

It is obvious from the decision of the board that this phase of the case, along with all other phases, was considered most thoroughly, the contentions on behalf of Ranney being stated fully and fairly and all the evidence being weighed with meticulous care. The question presented is purely one of fact, and we deem it proper to quote the board's statements and finding:

"The party Ranney has vigorously attacked the test of May 22, 1941 as a reduction to practice from a number of angles. He questions, first of all, the authenticity of Bridges Exhibit 3 in point of time, arguing that the evidence shows that the laminations of the transformer were produced by production dies which were not in existence until 1942, eight or ten months later than the May 1941 date. Several witnesses on both sides were acutely questioned as to this matter. The position of the party Ranney rests upon conclusions to be drawn from the comparison of measurements and appearance of the laminations of the transformer and of some which were admittedly made by the production die, and the proposition that Bridges stated that the windows in the laminations in Exhibit 3 were made by two cuts of a notching die whereas the stack of laminations when removed from assembled position in Exhibit 3 does not show ridge marks which would be expected if the notch were cut in two cuts instead of one.

"The direct testimony of Bridges is that the laminations for Exhibit 3 were cut in the shop with instructions from him as to the dimensions. When asked how many cuts were made to make the notches, or windows as they were frequently called, he said twice that he did not do the cutting himself and did not know. Upon being pressed for an answer based upon measurements that he was asked to make then and there upon the laminations and what he knew about 'the notching die' he stated in part 'To my knowledge of the die, I would say it was two cuts'. It is clear that Bridges was giving opinion testimony at this point. He certainly made it clear that he had no actual knowledge of the cutting of the laminations. It is not established therefore that the windows in the laminations of Exhibit 3 were in fact made with two cuts.

"We have closely scrutinized the laminations of each of the transformers of Exhibits 1, 2, and 3 of Bridges. We have compared dimensions of the laminations of Exhibit 3 with those of the laminations of Exhibit 34, said to have been made with the production die, by means of the micrometer used by the witnesses for the same purpose. We have compared the internal corners of the notches in these laminations by scrutiny under magnifying lenses. The dimensional correspondence is close, running to less than one thousandth of an inch in most of the direct measurements and not over two thousandths in any such measurement. But we cannot say that it is not within the skill of an expert die maker to make a die, given a lamination of Exhibit 3, which would duplicate the latter to a thousandth of an inch tolerance. Moreover the tool mark irregularities on the interior of the windows of the laminations of Exhibit 3 do not correspond with those on similar surfaces on Exhibit 34 laminations. Also, the interior angles of the large window particularly do not seem to perfectly match, the one at the branch of the E being perceptibly more irregular under the glass in the Exhibit 3 lamination than in the Exhibit 34 lamination, and vice versa with respect to the angle at the foot of the E.

While these observations do not establish that the laminations were *not* made by the same die, since effect of even slight wear and redressing of shearing edges on a die might account for such differences, neither do they offer foundation for the view that they *were* made by the same die.

"The large windows of the laminations of Exhibits 1 and 2 bear evidence of having been notched in two cuts; Exhibit 2 has a pronounced ridge, and the ridge or overlap is distinct in Ex. 1. The large window in the lamination of Exhibit 3 and small windows in all of these laminations do not show such an indication and the probability is that they were made in a single cut. The small windows measure 1 13/32", 1 13/32", and 1 5/16", respectively, in width (Dimension 1 in Ranney Brief opposite p. 26) for Exhibits 1, 2, and 3. This indicates that National had a 1 13/16" notching die. The pressman was unavailable as a witness and no witness knew how many dies National actually had. Whether Bridges had mistaken a 1 13/36" die for a 1 1/4" die which is one possibility, or whether National had a 1 1/4" die in addition to other sizes, is not determinable from the testimony. Bridges made it plain that in connection with the method of cutting the laminations in these Exhibits he was without actual knowledge, and the possibility of error in his views concerning this subject is not a suspicious circumstance sufficient to raise a doubt that the Exhibit in question was made and was in existence at the time testified to by Bridges and Noble."

We find nothing in the argument before us on behalf of Ranney which was not given ample consideration by the board in the foregoing quotation from its decision.

We think the board's reference, in the second paragraph quoted, to the effect that Bridges was giving opinion testimony when he said, "To my knowledge of the die, I would say it was two cuts," properly may be emphasized. Bridges was subjected to a most searching cross-examination, which clearly exhibited ability and skill on the part of Ranney's counsel. However, we do not find where any expression of Bridges was evoked by the cross-examination which differed upon any material matter from his testimony in chief, or which justifies any suspicion of his veracity.

We observe that the testimony of Ranney himself, following measurements which he made, to the effect that the laminations in Bridges' Exhibit 3 were "too beautiful" to have been made by a "notching die" was *opinion* testimony, as were all his deductions made from the presence or absence of ridges in the laminations.

The testimony of Olds also was *opinion* testimony, based, of course, upon measurements which he made.

We find nothing in the record which, as we view it, would jusitfy a finding that either Ranney or Olds possessed any greater skill in the electrical illumination art than Bridges possessed. If the matter of personal interest in the result, with its possible bearing on the weight of the testimony, is to be considered with respect to Bridges, it also must be considered with respect to Ranney.

Kuhl did not see Bridges' Exhibit 3 under construction, nor did he witness the test alleged to have been made May 22, 1941, but he testified to having seen the exhibit in the shop at about that time. He identified the time by the time of departure of Noble and Keiser on a trip to the West in connection with another device, referred to in the record as "P. U. [Power Unit] 240," which National was placing on the market. The lack of a definite description of Exhibit 3 by Kuhl would preclude a finding of corroboration in his testimony *taken by itself,* but to the extent that it may be considered at all, it *harmonizes* with that of Bridges and with that of Noble.

The testimony of Keiser, who witnessed the test, was not deemed by the board to have "much value with respect to establishing any particulars concerning the Bridges units," and we agree with that holding, but we see no reason to doubt that he did see an exhibit other than Exhibit 2 in May 1941. His testimony, standing alone, however, would not be sufficient to establish Exhibit 3 as being in existence because he did not identify it in sufficient detail, but what he did say is not inconsistent with,

nor in conflict with, the testimony of Bridges, Noble, and Kuhl.

As has been indicated, the witness Feiler was an independent die maker, having his own shop—Metro Manufacturing Company. National was one of his customers, but he was not one of National's employees, nor was he an employee of Boucher Inventions, Limited. He appears to have been skilled in the art of die making, and it is our view that his opinion evidence, based upon measurements which he made, is entitled to at least as much weight as that of Ranney and Olds, based upon measurements made by them.

It is unnecessary to quote the testimony of Feiler at length. The part with which we are impressed, so far as the phase of the controversy now being considered is concerned, was elicited during Feiler's cross-examination by counsel for Ranney, and is to the effect that the laminations of Exhibit 3 not only *could be* but *were* made "one at a time with a notching die." He was not shaken as to the opinion so expressed by the adroit and searching cross-examination which followed.

The testimony of Noble upon this phase of the controversy impresses us as being clear and unequivocal. If Bridges' Exhibit 3 was not in existence before the year 1942, it is impossible to escape the conclusion that Noble deliberately and intentionally falsified. We find no suggestion of any motive that would have led him to do so. He had no financial interest in the outcome of the controversy; his connection with National had ceased more than six years before he testified and we find nothing to indicate any hostility on his part toward Ranney or Ranney's assignee, the France Manufacturing Company. As stated in the brief for Bridges, he (Noble) testified in considerable detail about Exhibit No. 3, its construction, means of identifying it, and various observations respecting the transformer and its performance, which in certain respects was similar to the performance of the unit P. U. 240 embraced in the Boucher-Kuhl patent hereinbefore mentioned.

It is argued, in effect, on behalf of Ranney that the opinion testimony of himself and Olds created such doubt relative to the existence prior to 1942 of Bridges' Exhibit 3 that it may not be held properly that Bridges met the burden incumbent upon him as the junior party to establish that it did exist in 1941—specifically, on May 22, 1941.

We are unable to accept this view. Whatever of corroboration of Bridges may be lacking in the testimony of Keiser and Kuhl on this phase of the case is supplied amply by the testimony of Noble.

■ We turn now directly to the question of reduction to practice, which, in the opinion of the board, was solely dependent upon whether Bridges was sufficiently corroborated. In other words, the board accepted the testimony of Bridges as true, but, in conformity with the authorities, referring particularly to the decision of this court (the late Judge Irvine L. Lenroot being the author of the opinion) in the case of Kear v. Roder, 115 F.2d 810, 28 C.C.P.A., Patents, 774, held, in effect, that however credible the testimony of Bridges may be, he cannot prevail without corroboration. The board deemed the instant case distinguishable from the Kear v. Roder case and, as we view the controversy, that constitutes the principal issue for our determination.

■ It will be understood that in considering allegations of error as to findings of fact made by the tribunals of the Patent Office this court follows the proper and well established practice of appellate courts in refusing to reverse such findings unless we are convinced from our own study of the record that the findings are manifestly wrong because against the weight of the evidence. The rule, of course, is applicable here, and we have given prolonged and painstaking study to the voluminous record before us.

An independent review of the record by us, however, could be little more than a paraphrase of the language of the board and, having in mind the importance of the decision not only because of the interests immediately involved but because of precedent possibilities, we deem it proper to embody in our decision the following lengthy but incisive discussion by the Board of In-

terference Examiners, the italics being supplied by us:

"The weakest point in the case for the test of Bridges Unit No. 3 (Exhibit 3) as a reduction to practice on May 22, 1941, lies not, in our opinion, in uncertainty in the existence of that apparatus at that time as it appears in evidence now, nor in uncertainty that such unit performed in the transformer operation of fluorescent gas lamps in a manner which was satisfactory according to the aims and objectives of the invention defined by the counts, but *in the corroboration of the circuit connections of the apparatus identified as Exhibit 3 at that test as corresponding to the recitation in the counts*. The party Ranney makes the point the witness Noble, *whose testimony must be relied upon if corroboration as to identity is to be established,* did not make particular reference to the circuit connections used in the test, the argument being that *if Noble did not examine the connections he could not know that they were arranged to conform to the counts*. The question raised therefore is whether the situation was like that in Kear v. Roder, 115 F. 2d 810, 28 C.C.P.A. [Patents] 774; 1941 C.D. 158; in which the witness was a supervisor of the inventor who received essential information as to what elements were present in the apparatus he saw tested from statements and reports made to him by the inventor. *The nature of the invention in that case was such that the presence of the elements thereof in proper relation was not apparent from mere visual inspection of the apparatus,* part of which operated remotely, by radio link, from the other, and successful operation at the test could, as we recollect it, be established only by comparison of calculations made from instrument readings. We incline to distinguish this case from that of Kear v. Roder. *We note that the elements of the counts are apparent upon inspection of the device*. The elements of conventional transformer construction, a core, one or more coil bodies through which the core passes, and if present, one or more shunt magnetic paths formed upon the core between coil bodies are all identifiable upon sight of such a device, viewed 'unpotted',

by one who is experienced in supervising the manufacture of them even though such person may not be schooled in the analysis of electronic and magnetic flux. The classification or distinction of the coils as 'primary' or 'secondary' is also apparent when connected to power source and load. As a matter of fact this is the only way in which the designation is establishable, since there is no intrinsic property of a coil of wire per se wound upon a magnetic core which makes it either one or the other. In the case of the physical embodiment of the counts, the coils connected to lamp tubes make such coils secondaries by definition of the term and likewise the coil connected to the line would be the primary. The fact of connection in the case of Bridges Exhibits 1, 2, and 3 operating two 48 inch fluorescent tubes such that each of two coils operated one tube and another coil received power from a power source is clearly observable without running ones fingers along each of the maximum of six wires leading to the coils. Nor are we of the opinion that reduction of the number of leads by using a common return in conventional fashion, or the connection of the coils 'autotransformer' fashion are obscuring conditions, unless determination of the latter as a fact is required, which it is not in this case. The fact that one of the two visible windings on Bridges exhibits 1, 2, and 3 is a compound coil containing two windings is not troublesome because the leads show the presence of two windings, and Noble witnessed the winding of this coil for each of these exhibits. We think, notwithstanding some confusion in terminology, that his testimony indicates that he understood that the compound coil, which he referred to as the 'long coil', provided two windings. The condenser used was a commercial product bearing the manufacturers name and the rating—'1.6 Mfd. 550 V. A. C.' Noble testified that such a one was used at the test of Exhibit 3 and was connected to the transformer at that test. At this point we note that the Exhibit 3 as shown to the witnesses and introduced in evidence had a TOBE 1.6 Mfd. 550 V. A. C. Type NAT 101 connected to the small gage lead of the long coil by twisted end of

that lead through an eye in one connector lug, and from the witness' statement that the condenser that was attached when tested was that one or one just like it, and that it was attached just like it, an inference may be drawn that it was so connected when operating the tube lamps at that test. The witness called the long coil a secondary, and if this be recognition on his part of the functioning of the winding as a secondary, it places the condenser where it is required by the counts. If this were all there was to support Bridges' case at this point we would say that it failed to meet the requirements of corroboration which are admittedly high. However there are other statements of this witness and Kuhl which form a part of the entire corroborative circumstance. The construction and testing, seriatim, of Bridges 'Units' 1, 2, and 3 was for Noble a part of the same project, namely, the determination of whether the system proposed by Bridges in his letter dated September 8, 1940, would work and we can put no other construction upon the testimony of this witness than that he was fully convinced that each of these pieces of apparatus in each of the three tests was an embodiment of that system, the only difference being that they varied in size of core and in the coil parameters, wire size and number of turns. For his understanding of the apparatus beyond what he could ascertain by inspection he was not dependent upon the reports and representations of the inventor alone, but had the benefit of his engineer Boucher who built and tested in his presence the first and second units, and the benefit of his engineer Kuhl who was present at these two tests. These men were independent professional advisors who were in a sense rivals to Bridges in this field. Boucher has departed this life, and was therefore not available as a witness (though we do not thereby ignore his existence as a fact), but Kuhl supplied definite recollections concerning details of the apparatus which was tested and the manner of testing. To the point we are considering, and among other things, Kuhl makes it quite clear that the connection of the condenser to the transformers in these tests was to the secondary which was closely

coupled to the primary, as required by the counts, carefully noting that the condenser was not a single one like that which he viewed on the sand as part of Bridges' Exhibit 3, but was composed of two condensers connected in parallel to the value of about 1.85 mfd. Kuhl observed that unit number 1 in its test did not quite balance the two tubes as to light output, but that unit number 2 in its test produced balanced operation of the tubes and was satisfactory as to brilliance of the light. He expressed the view that it was a 'commercial model' at that point. But for Noble's contemporary view that unit number 2 could and should be made smaller, and his unwillingness to stamp the experimental work complete at this stage, the counts might be considered reduced to practice by the testing of this unit. However, Noble considered the testing of unit 3 as merely the testing of a final model of unit 2, differing only in size of transformer and of condenser. The inference that the circuit detail as to the series condenser connection was the same in the test of unit No. 3 as it was in the tests of Units Nos. 1 and 2 is thus quite strong. Another circumstance pointing to the series connection of the condenser to the closely coupled secondary coil at the May 22, 1941 test is that of lack of stroboscopicity observed by Noble at this and the test of unit number two by hand test, and the similar observations by Kuhl at the test on number two. The significance is this. There was no mystery about the stroboscopic effect. It is and was well known that the effect is very distinct with a gas tube, or with several gas tubes operating in phase, and it was and still is conventional practice to operate a pair of tubes or for that matter any light sources, out of phase by retarding the phase in one tube by an inductive impedance and advancing the phase in the other tube by a capacitive impedance. Overlap of periods of maximum luminosity of one light source with periods of minimum luminosity of the other light source reduces the flicker. The amount of flicker from a pair of tubes operated from a common A. C. source is a rough test of phase displacement between the currents in the tubes. The transformers of each of

the Bridges units has one secondary which shows by its arrangement on the core that its circuit would be highly reactive. The testimony of Kuhl above referred to, or Kuhl and Noble together establish that the second unit was operated with a condenser of a little less than 1.85 mfd. in series with the other secondary and that such an arrangement produced significant reduction in flicker, as good as that produced by prior art fixtures for the same lamps. The testimony of Noble that the third unit with a condenser of the same order of magnitude attached (1.6 mfd.) also showed as good a reduction in the flicker therefore tends to support the conclusion that the mode of attachment was the same as that in the case of the second unit. These points are illustrative of the corroborative circumstances. We have carefully weighed all of them and are convinced that the Bridges unit number three was connected in circuit with two fluorescent tube lamps at the tests of May 22, 1941 in a manner responding to the requirements of the counts."

It should be said that Noble did not present written memoranda with his oral testimony relating to the test of Bridges' Exhibit 3 made on May 22, 1941, as he did in connection with the tests of Exhibits 1 and 2, and it is argued on behalf of Ranney that "inferences based on tests of Exhibits 1 and 2 cannot be used for corroboration of test of Exhibit 3." In support of this contention the brief cites a decision made June 5, 1906, by the Court of Appeals of the District of Columbia, our predecessor in patent jurisdiction, in the interference case of Robinson v. Thresher, 28 App.D.C. 22. The court there affirmed the decision of the Commissioner of Patents reported in 1906 C.D. 280, 123 O.G. 2627. We have studied that case carefully. It is obvious that the facts there found differ from the facts found in the instant case.

It is true, of course, that the tests of Exhibits 1 and 2 do not constitute a reduction to practice of Exhibit 3, but it must not be overlooked that Bridges was endeavoring to develope a device such as that finally embodied in his Exhibit 3, and that Exhibits 1 and 2 were produced during the period of such endeavor. We find no error in the consideration given by the board to the tests of Exhibits 1 and 2 as factors in the Bridges endeavor.

Another contention made on behalf of Ranney is that "Bridges activities amount to an abandoned experiment."

It is true that Bridges did not make application for patent until June 25, 1942, which was more than a year after the reduction to practice of May 22, 1941, but we find nothing in the record which would justify a holding that either he, or his assignee, National, had abandoned the invention.

It appears that in order successfully to market a device in the electrical illumination field approval of it must be had by Insurance Company Underwriters, and frequently much time is required in securing such approval. National had received approval of its P. U. 240 (catalogue No. 999) and was marketing same. It, therefore, did not hurry to file an application for patent on the device represented by Bridges' Exhibit 3. Furthermore, the record indicates that, for a time after May 22, 1941, there was a question as to whether Boucher should not be joined with Bridges as co-inventor, a matter which Boucher himself settled by a statement contained in a letter to the attorney who had charge of drafting Bridges' patent application. The letter (Ranney's Cross Exhibits 16) bears date of June 8, 1942. The application, as has been stated, was filed June 25, 1942.

We think there is no evidence indicating that Exhibit 3 was an abandoned experiment.

Following the oral argument before us counsel for Bridges moved to correct diminution of the record by adding "the complete Patent Office file of the Bridges patent 2,370,635 here involved, as well as a copy of the complete Patent Office file of the companion Boucher-Kuhl patent 2,370,-633."

Counsel for Ranney filed opposition to the motion "except upon an order that the costs thereof shall be borne entirely by the party Bridges."

In the notice of opposition it is said: "* * * There is no showing that the

files of the Bridges Patent No. 2,370,635 and of the Boucher-Kuhl Patent No. 2,370,-633 are necessary for determination by this Court of the question of priority as between Ranney and Bridges * * *."

We have considered the motion along with the merits of the case, and we agree that the matters sought to be added are in nowise necessary to a decision of the case. So, the motion is denied.

No further discussion of the record for Ranney is necessary.

■ For the reasons stated, the decision of the Board of Interference Examiners is affirmed.

Affirmed.

### Supplemental Opinion

Following the filing of the foregoing opinion on January 16, 1951, a petition for rehearing was filed for appellant on February 3, 1951, and notice of opposition thereto was filed on behalf of appellee on February 15, 1951.

Thereafter, specifically on February 23, 1951, before any action on the petition for rehearing had been taken by the court, counsel for appellant filed a paper entitled:

"Motion to Suspend Further Proceedings, to Reopen and to Remand for Taking Further Testimony."

In the motion it was alleged, in substance, that appellant had located a witness "within the past few days" who "allegedly cut the laminations for Exhibit 3," discussed in our opinion, and an affidavit of the witness stating what his testimony would be in the event he should be called to testify was filed with the motion to reopen.

The motion to reopen and remand was opposed on behalf of appellee in a paper filed March 2, 1951, with which there also was filed another affidavit by the same person whose affidavit had been filed with the motion on behalf of appellant.

The court has fully considered both the petition for rehearing and the motion to reopen and remand.

■ As to the former, we find nothing which leads us to conclude that we erred in our decision rendered January 16, 1951. So, the petition is denied.

■ As to the latter, a study of the respective affidavits (which, it may be said, in justice to the individual, do not show any marked discrepancy as to any material fact) convinces us that such testimony as the affidavits indicate the party would give if called as a witness properly could not cause any change in the conclusion originally reached by the Board of Interference Examiners and affirmed by us. So, the motion to reopen and remand also is denied.

Our decision rendered January 16, 1951, is reaffirmed.