# United States Court of Appeals for the Federal Circuit

---

**IN RE TELES AG INFORMATIONSTECHNOLOGIEN AND SIGRAM SCHINDLER BETEILIGUNGSGESELLSCHAFT MBH**

---

2012-1297

---

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences in Reexamination No. 90/010, 017.

---

Decided: April 4, 2014

---

MICHAEL D. KAMINSKI, Foley & Lardner LLP, of Washington, DC, argued for appellants. With him on the brief were HOWARD N. SHIPLEY, GEORGE E. QUILLIN, and RYAN A. SCHMID.

AMY J. NELSON, Associate Solicitor, Office of the Solicitor, United States Patent and Trademark Office, of Arlington, Virginia argued for appellee. With her on the brief was NATHAN K. KELLEY, Deputy Solicitor. Of counsel was SCOTT C. WEIDENFELLER, Associate Solicitor.

FRANK E. SCHERKENBACH, Fish & Richardson, P.C., of Boston, Massachusetts for amicus curiae. Of counsel on the brief was CRAIG E. COUNTRYMAN, of San Diego, Cali-

fornia; and HOWARD G. POLLACK and MICHAEL R. HEADLEY, of Redwood City, California.

_____

Before DYK, MOORE, and WALLACH, *Circuit Judges.*

DYK, *Circuit Judge.*

Teles AG Informationstechnologien and Sigram Schindler Beteiligungsgesellschaft MBH (collectively, "Teles") own all substantial rights in U.S. Patent No. 6,954,453 ("the '453 patent") on a method and apparatus for transmitting data in a telecommunications network. The Patent and Trademark Office ("PTO") conducted an *ex parte* reexamination of the '453 patent and rejected claims 34–36 and 38 as obvious under 35 U.S.C. § 103. The Board of Patent Appeals and Interferences ("Board") affirmed. Teles brought suit in the United States District Court for the District of Columbia, challenging the Board's decision pursuant to 35 U.S.C. § 145 (2006). We agree with the district court that it lacked subject matter jurisdiction, and hold that the version of § 145 in effect at the time did not authorize a patent owner in an *ex parte* reexamination to bring suit in district court challenging the Board's action. But we hold that the district court erred in dismissing the case and instead should have transferred the case as it attempted to do after the dismissal. We treat the case as having been transferred to this court and consider it as an appeal from the Board's decision. We affirm the Board's rejection of claim 35 as obvious under § 103.

BACKGROUND

I

In 1980, Congress established a system of *ex parte* reexamination that allowed patent owners and third parties to ask the PTO to reexamine claims of issued patents in view of prior art. *See* An Act to Amend the

Patent and Trademark Laws, Pub. L. No. 96-517, 94 Stat. 3015 (1980) (codified at 35 U.S.C. §§ 302–07 (1986)). We have recognized the "important public purpose" behind reexamination as "part of a larger effort to revive United States industry's competitive vitality by restoring confidence in the validity of patents issued by the PTO." *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 601 (Fed Cir. 1985); *see also* H.R. Rep. No. 96-1307(I), at 3 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6462 (describing the goal of "strengthen[ing] investor confidence in the certainty of patent rights by creating a system of administrative reexamination of doubtful patents").

Section 145 has long authorized patent applicants to challenge the Board's adverse examination decisions in district court instead of directly appealing to this court pursuant to 35 U.S.C. § 141. *See Kappos v. Hyatt*, 132 S. Ct. 1690, 1694 (2012). After the reexamination statute was enacted, we allowed patent owners to challenge adverse *ex parte* reexamination decisions in district court pursuant to § 145. *See Joy Techs., Inc. v. Manbeck*, 959 F.2d 226, 227 (Fed. Cir. 1992). In 1999, Congress amended § 145 and related provisions. This case raises the question of whether § 145 civil actions remained available to patent owners seeking to challenge adverse reexamination decisions after Congress amended the statute in 1999 and before 2011, when Congress amended the statute to clarify that § 145 review was not available to patent owners.

II

Teles is the owner of the '453 patent, which issued on October 11, 2005. '453 patent, at [45]. The '453 patent recites a "method for transmitting data in a telecommunications network and switch for implementing said method." *Id.* at [54]. In August 2007, a third party filed a request that the PTO conduct an *ex parte* reexamination of the '453 patent. The examiner rejected claims 34–36

and claim 38 under 35 U.S.C. § 103 as obvious over U.S. Patent No. 6,069,890 ("White") combined with either U.S. Patent No. 6,137,792 ("Jonas") or U.S. Patent No. 4,996,685 ("Farese"). Teles appealed the rejections to the Board, which affirmed. Teles then sought review of the Board's decision in the United States District Court for the District of Columbia pursuant to § 145. The district court dismissed the case for lack of subject matter jurisdiction, holding that, after the 1999 amendments, § 145 proceedings could not be maintained by patent owners.

Teles appealed the district court's dismissal for lack of subject matter jurisdiction to this court pursuant to 28 U.S.C. § 1295(a)(1). Teles did not appeal the Board's decision to this Court.

DISCUSSION

I

We address initially the question of jurisdiction. While we have jurisdiction to review the district court's dismissal pursuant to § 1295(a)(1), the question is whether we also have jurisdiction to review the Board's action (if the district court lacked jurisdiction). After the district court granted the motion to dismiss, it also purported to transfer the case to this court pursuant to 28 U.S.C. § 1631. A transfer "is not proper when combined with a dismissal." *Hollyanne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 (Fed. Cir. 1999); *see also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 797, 818 (1988). Once the district court dismissed the case for lack of jurisdiction, it "was without authority to transfer the case." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 173 (D.C. Cir. 2006).

But we hold that the district court erred in dismissing the case rather than transferring it. Once the district court held that it lacked jurisdiction, it should have transferred the case pursuant to § 1631. *See Paul v. I.N.S.*, 348 F.3d 43, 47 (2nd Cir. 2003); *see also Kolek v.*

*Engen*, 869 F.2d 1281, 1283–84 (9th Cir. 1989). Here, as in *Paul* and *Kolek*, the statutory deadline for filing an appeal to this court had passed, and no evidence suggested bad faith in Teles' filing with the district court. Under these circumstances, it was in the interest of justice to transfer the case pursuant to § 1631, and we "treat [Teles'] petition for review, which was timely filed with the district court, as if it had been properly transferred" to this court rather than dismissed. *Paul*, 348 F.3d at 47 (citing *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (district court correctly determined that it lacked jurisdiction but abused its discretion in failing to consider whether transfer was in the interest of justice)); *see also Kolek*, 869 F.2d at 1284 (treating dismissal as transfer where appellate court had exclusive jurisdiction and timely filing deadline had passed); *In re McCauley*, 814 F.2d 1350, 1352 (9th Cir. 1987) (reviewing merits of dismissed appeal as if properly transferred to appellate court).

In reviewing the case as though the district court had transferred the case, we address (1) the district court's jurisdiction, and (2) if the district court lacked jurisdiction, the Board's decision on the merits. We review both the district court's dismissal for lack of jurisdiction and the question of statutory interpretation underlying that dismissal de novo. *Mudge v. United States*, 308 F.3d 1220, 1224 (Fed. Cir. 2002) (citing *Strickland v. United States*, 199 F.3d 1310, 1313 (Fed. Cir. 1999) and *Muniz v. United States*, 972 F.2d 1304, 1309 (Fed. Cir. 1992)). We review the Board's decisions de novo for errors of law and for substantial evidence as to questions of fact. *In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1351 (Fed. Cir. 2014) (citing *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012)).

## II

On its face, even before the 1999 amendments, § 145 only provided for district court actions brought by patent "applicants." Nonetheless, in *Joy Technologies*, we construed § 145 as applicable to a "patent owner" involved in an *ex parte* reexamination. 959 F.2d at 229. This construction of the statute was continued in later cases. *See Takeda Pharm. Co., Ltd. v. Doll*, 561 F.3d 1372 (Fed. Cir. 2009); *In re Lueders*, 111 F.3d 1569, 1577, n.14 (Fed. Cir. 1997); *Boeing Co. v. Comm'r of Patents & Trademarks*, 853 F.2d 878, 881 (Fed. Cir. 1988).

In 1999, Congress amended the Patent Act to create a system of *inter partes* reexamination that allowed third parties who had requested the reexamination to participate actively in the PTO reexamination process.[1] When Congress created the *inter partes* reexamination system, it changed the text of existing statutory provisions, including §§ 134, 141, and 145. The district court concluded that these changes made § 145 unavailable to patent owners (as opposed to patent applicants).

First, Congress amended § 141, which provided for appeals of Board decisions to this court, by inserting an express limitation on the appeal rights of patent owners in any reexamination proceeding: "A patent owner in any

---

[1]   *See* American Inventors Protection Act ("AIPA"), enacted as part of the Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501 (1999); 35 U.S.C. §§ 311, 316; *see also* 145 Cong. Rec. H6944 (1999) (statement of Rep. Dana Rohrabacher) (describing legislative effort to "further encourage potential litigants to use the PTO as a[n] avenue to resolve patentability issues . . . [by] creat[ing] an additional reexam option that permits a 3rd party requestor to file additional written briefs").

reexamination proceeding dissatisfied with the final decision in an appeal to the Board of Patent Appeals and Interferences under section 134 *may appeal* the decision *only* to the United States Court of Appeals for the Federal Circuit." 35 U.S.C. § 141 (2000) (emphases added).

Second, Congress changed the substance and structure of § 134, governing appeals to the Board. Before 1999, § 134 mentioned only patent applicants: "An applicant for a patent, any of whose claims has been twice rejected, may appeal from the decision of the primary examiner to the Board of Patent Appeals and Interferences, having once paid the fee for such appeal." 35 U.S.C. § 134 (1994). As amended, the section for the first time addressed patent applicants, patent owners, and third party requesters individually, as follows:

> a) PATENT APPLICANT.—An applicant for a patent, any of whose claims has been twice rejected, may appeal from the decision of the administrative patent judge to the Board of Patent Appeals and Interferences, having once paid the fee for such appeal.

> (b) PATENT OWNER.—A patent owner in any reexamination proceeding may appeal from the final rejection of any claim by the administrative patent judge to the Board of Patent Appeals and Interferences, having once paid the fee for such appeal.

> (c) THIRD-PARTY.—A third-party requester in an *inter partes* proceeding may appeal to the Board of Patent Appeals and Interferences from the final decision of the administrative patent judge favorable to the patentability of any original or proposed amended or new claim of a patent, having once paid the fee for such appeal. The third-party requester may not appeal the decision of the Board of Patent Appeals and Interferences.

35 U.S.C. § 134 (2000).[2]

Third, Congress amended § 145, which previously referenced § 134 generally, to refer only to § 134(a), governing patent applicants:

> An applicant dissatisfied with the decision of the Board of Patent Appeals and Interferences in an appeal under section *134(a)* of this title may, unless appeal has been taken to the United States Court of Appeals for the Federal Circuit, have remedy by civil action against the Director in the United States District Court for the District of Columbia . . . .

35 U.S.C. § 145 (2000) (emphasis added). On their face, these amendments would appear to restrict § 145 appeals to patent applicants. However, Teles argues that § 145 continued to be available to patent owners.

Teles' first argument is that the phrase in § 141 stating that a patent owner "may appeal the [adverse reexamination] decision only to the United States Court of Appeals for the Federal Circuit" does not preclude an owner from invoking the provisions of §§ 145 and 306 because a civil action under § 145 is not an "appeal." Under Teles' interpretation, the "only" restriction limits patent owners' appeals to this court as opposed to other circuit courts and does not limit the availability of § 145 district court review to patent owners. But this reading makes the provision entirely superfluous because this court already had exclusive jurisdiction over decisions of the Board. 28 U.S.C. § 1295 (a)(4)(A) (1994). Significantly, § 141 did not subject patent applicants to a similar limitation, stating that "[a]n applicant dissatisfied with the

---

2    In 2002, Congress amended § 134, substituting "primary examiner" for "administrative patent judge." 35 U.S.C § 134 (2006).

decision in an appeal to the Board of Patent Appeals and Interferences under section 134 of this title *may appeal* the decision to the United States Court of Appeals for the Federal Circuit." 35 U.S.C. § 141 (2000) (emphasis added). If the "only" limitation were designed to restrict appeals to this court, rather than other circuit courts, it is hard to understand why Congress would not employ similar language as to patent applicants.

Teles' second argument is that the conclusion that the 1999 amendments restricted § 145 to patent applicants is inconsistent with the language of § 306, pertaining to appeals by patent owners in *ex parte* reexaminations. After the 1999 amendments, § 306 continued to read:

> The patent owner involved in a reexamination proceeding under this chapter may appeal under the provisions of section 134 of this title, and *may seek court review under the provisions of section 141 to 145 of this title*, with respect to any decision adverse to the patentability of any original or proposed amended or new claim of the patent.

35 U.S.C. § 306 (2000) (emphasis added). Teles argues that the reference in § 306 to "the provisions of section 141 to 145" shows that § 145 continues to be available to patent owners. But this inconsistency in retaining a reference to § 145 in § 306 does not undermine the clear intention of the 1999 amendments to eliminate § 145 as to patent owners.

In *Chickasaw Nation v. United States*, the Supreme Court considered a similar question involving an apparent contradiction between statutory language and an internal cross-reference. 534 U.S. 84 (2001). There, the question was whether Indian tribes were exempt from paying certain taxes. One subsection of the statute stated that "Internal Revenue Code provisions that 'concer[n] the reporting and withholding of taxes' with respect to gambling operations shall apply to Indian tribes in the same

way as they apply to the States," but also stated "in its parenthetical that those provisions 'includ[e]' Internal Revenue Code 'chapter 35.'" *Id.* at 87 (alterations in original). Chapter 35, however, said "nothing about the *reporting* or *withholding* of taxes, [but] simply *impose[d]* taxes . . . from which it exempt[ed] certain state-controlled gambling activities." *Id.* The Indian tribes claimed that the chapter 35 reference exempted them from paying taxes from which states were similarly exempt. *Id.*

Faced with this apparent contradiction, the Supreme Court held that "[t]he language of the statute is too strong to bend as the Tribes would wish—*i.e.*, so that it gives the chapter 35 reference independent operative effect." *Id.* at 89. The Court explained that "the language outside the parenthetical is unambiguous. It says without qualification that the subjection applies to 'provisions . . . concerning the reporting and withholding of taxes.'" *Id.* In light of such strong and unambiguous language, making the chapter 35 reference effective on its own would have required "seriously rewriting the language of the rest of the statute." *Id.* Rather than reach that result, the Court concluded that "in context, common sense suggests that the cross-reference is simply a drafting mistake," and that Congress "unintentionally failed to remove what had become a superfluous numerical cross-reference." *Id.* at 91, 92. The same is evidently true here with respect to the retention of the cross-reference to § 145 in § 306.

The fact that in the case of an *inter partes* reexamination, § 315, as of the time of the 1999 amendments, provided for an appeal by the patent owner "under the provisions of sections 141 through 144," 35 U.S.C. § 315(a)(1) (2000), merely confirms the likelihood that the reference to § 145 in § 306 was a drafting error. Moreover, the fact that § 145 on its face applied only to "applicants" and not owners helps to explain why Congress could have failed to focus on the drafting error in § 306.

Teles argues, however, that here, legislative history demonstrates that Congress deliberately retained the reference to § 145 in § 306. Teles points out that bills proposed before 1999 would have amended § 306 to eliminate the reference to § 145, and that these bills were not adopted. This does not assist Teles. As the Supreme Court held in *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, reliance on failed legislative proposals is disfavored as a means of inferring legislative intent. 531 U.S. 159, 169 (2001).

Teles also relies on the fact that during consideration of the 1999 amendments, one of the bills proposed to amend § 306 by eliminating the reference to § 145. *See* American Inventors Protection Act of 1999, H.R. 1907 106th Cong. (as introduced); *see also* H. Rep. 106-287(I), at 59–60 (Aug. 3, 1999) (describing proposed changes to § 306). But the proposed section made an even more significant change: it gave third party requesters in *inter partes* examinations the right to appeal Board decisions to this court or to become parties in appeals taken by patent owners. When the bill was reported out of the House Judiciary Committee, this provision was removed.[3] The debate on the provision suggests nothing about a decision to retain § 145 for patent owners, but demonstrates that the provision was removed because of opposition to giving appeal rights to third parties in *ex parte* examinations.

During the House debate over the bill, Representative Lofgren asked about this change, but only with respect to the removal of third parties' appeal rights. 145 Cong. Rec. 6942 (statement of Rep. Zoe Lofgren). The response to

---

[3] Although third parties in *inter partes* examinations were given the right to appeal to this court in 2002, Pub. L. 107-273 § 13106(c), such appeals remain unavailable to third parties in *ex parte* examinations. *See* 35 U.S.C. § 141 (2012).

Representative Lofgren's question similarly focused on the impact it would have on the rights of third party requesters, not patent owners. *See* 145 Cong. Rec. H6942 (statement of Rep. Coble) (explaining that the change "was done for the benefit of the independent inventors to balance the interest of a third party with those of a . . . patentee, by allowing a third party to pursue reexamination . . . while assuring that a patentee would not be subject to harassment in such proceedings"). There was no suggestion that the provision was rejected in an attempt to retain § 145 review for patent owners.[4]

The only specific reference to the appeal rights of patent owners is Senator Lott's statement that "[t]he patentee is not entitled to the alternative of an appeal of an *inter partes* reexamination to the U.S. District Court for the District of Columbia. Such appeals are rarely taken from *ex parte* reexamination proceedings under existing law and its removal should speed up the process." 145 Cong. Rec. S14720. Interestingly, Senator Lott viewed the amendment to § 141 discussed above as precluding § 145 review: "a patent owner in a reexamination proceeding may appeal an adverse decision . . . only to the U.S. Court of Appeals for the Federal Circuit as earlier noted." *Id.* at

---

[4]    Teles' other references to statements during floor debates do not show that the § 145 reference remained because of legislative intent rather than inadvertence. *See, e.g.*, 145 Cong. Rec. H6942 (statement of Rep. Zoe Lofgren) ("[T]he bill was amended to retain existing law for *ex parte* reexaminations . . . ."); 145 Cong. Rec. S14720 (statement of Sen. Trent Lott) ("Subtitle F leaves existing *ex parte* reexamination procedures in Chapter 30 of title 35 intact."). These statements do not say anything about the appeal rights of patent owners after completion of the reexamination.

S14721. These statements hardly indicate a desire to retain § 145 review for patent owners.

Finally, Teles argues that the 2011 amendments to § 306 show that the 1999 amendments left the appeal rights of patent owners intact. When Congress enacted the America Invents Act in 2011, it amended § 306 by limiting patent owners to review "under the provisions of sections 141 to 144." *See* Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-129, 125 Stat. 284 (2011) (codified as amended at 35 U.S.C. § 306 (2011)). The 2011 amendments thus removed the cross-reference to § 145 in § 306 (but were not retroactive). Teles argues that this change demonstrates that § 306 before the changes preserved § 145 for patent owners.

Teles' theory contradicts the legislative history, which recognized that the amendments corrected a drafting error in the 1999 legislation: "§ 306 is amended to conform to the changes made by § 4605 of the American Inventors Protection Act of 1999, Public Law 106-113 to §§ 134 and 141 of Title 35." H.R. Rep No. 112-98(I), at 77 (2011) (Statement of Rep. Smith) (June 1, 2011); *see also* 157 Cong. Rec. S1377 (daily ed. Mar. 8, 2011) (statement of Sen. Kyle) ("It is fairly apparent, however, that [the authority for a patent owner to bring a civil action under § 145] was intended to be eliminated by the amendments made by section 4605 of the American Inventors Protection Act of 1999, Public Law 106-113, to sections 134 and 141 of Title 34 . . . . The AIPA neglected, however, to eliminate a cross reference to section 145 in section 306 of Title 35 . . . ."). Amendments intended to clarify statutory language do not indicate that the original language should be construed to mean the opposite of the clarifying language. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 591 & n.12 (2010) (referencing statements in legislative history as evidence that amendment intended to clarify, rather than change, the scope of existing statutory provision). The 2011 amend-

ments do not manifest Congress' intent to preserve the availability of § 145 in the earlier version of the section.

We therefore hold that the 1999 amendments eliminated the right of patent owners to secure review under § 145, and affirm that the district court lacked jurisdiction over the § 145 action.

## III

We turn next to Teles' appeal of the Board's rejection of claim 35.[5] This claim was rejected on the ground that the claim would have been obvious.

### A. Claim Construction

Teles argues that the Board's decision rests on an incorrect claim construction. During reexamination, the PTO must give claims their "broadest reasonable construction consistent with the specification." *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007). We review de novo the Board's claim construction to determine if it gives claims their broadest reasonable construction. *Rambus v. Rea*, 731 F.3d 1248, 1252 (Fed. Cir. 2013); *see also In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012).

Claim 35 depends on independent claim 34, which recites a "[s]witching apparatus for routing a telephone call . . . selectively by line switching or packet switching." '453 patent col. 14 ll. 48–53. Dependent claim 35 reads:

> **35.** The switch of claim **34**,[6] further comprising means to produce the control signal for trans-

---

5    The Board also rejected claims 34, 36, and 38, but Teles does not challenge these rejections on appeal.

6    The full text of claim 34 reads:

ferring to a line-switching transfer or a packet-switching transfer to the second end terminal, said control signal being produced automatically

---

**34.** Switching apparatus for routing a telephone call comprising non-packetized data from a first end terminal located at a user's premises to a second end terminal located at another user's premises, selectively by line switching or packet switching, the switching apparatus comprising:

means for establishing a connection through a line-switching network to the second end terminal;

means for line-switching transferring data received from the first end terminal as non-packetized data over the line-switching network to the second end terminal;

means for establishing a connection through a packet-switching network to the second end terminal;

means for packet-switching transferring data received from the first end terminal as non-packetized data over the packet-switching network to the second end terminal; and

means responsive to a control signal for transferring to a line-switching transfer or a packet-switching transfer to the second end terminal;

said means responsive to a control signal changing-over to a line switching data transfer or a packet-switching transfer during the existing transfer with the presence of said control signal.

'453 patent col. 14 l. 48 to col. 15 l. 4.

> when demands on the quality of the data transfer are understepped or exceeded.

'453 patent col. 15 ll. 5–10.

Claim 35 pertains to the utilization of line switching and packet switching in routing telephone calls. Line switching and packet switching are two different types of telecommunications technologies. In line switching, "a connection is continually provided in real time with the complete bandwidth of a channel between two points" reserved for that connection. *Id.* col. 1 ll. 39–41. The fixed bandwidth allows for communications that are "free of any time delays," but can be "expensive, particularly during telephone conversations since the costs accumulate irrespectively of the information actually transferred." *Id.* col. 1 ll. 44–48. Packet switching operates "quite differently from line-switching exchanges, [in that] a fixed connection does not have to be maintained . . . i.e., each packet is treated individually and not in conjunction with others." *Id.* col 1. ll. 33–34, 56–59. The Internet is an example of a network that uses packet switches (routers) to transfer data. *Id.* col. 1. ll. 60–67. Although packet-switching can provide connections cheaply, it can also produce significant time delays. *Id.* col. 2. ll. 3–7, 15–21. Claim 35 is directed to a device for switching from a packet-switched network to a line-switched network "automatically when demands on the quality of the data transfer are understepped or exceeded." *Id.* col. 15 ll. 5–10.

The Board construed the claimed "means to produce the control signal" under § 112 ¶ 6 (now § 112(f)). Section 112 ¶ 6 provides that functional claim language, like the "means to produce the control signal" element of claim 35, "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6 (2006). The Board defined the function as "produc[ing] the control signal for

transferring to a line-switching or a packet-switching transfer to the second end terminal." J.A. 1435. The Board agreed with the examiner that, in order to release a control signal, the claim required monitoring factors related to demands of quality, but did not limit those factors to include only the bandwidth of a particular transfer. The Board explained that "by using the broad term 'demands of quality,' claim 35 is not limited to the 'bandwidth of a transfer,'" and that the time delay of a transmission was an example of a "quality factor." J.A. 1435. The Board found that the structure corresponding to the claimed means was the change-over device, identified in Figure 4 by label 711.

While Teles' argument is not entirely clear, it appears that Teles argues that the Board erred by not construing the function of claim 35 to be defined by the description of structure in the following portion of the specification:

> Alter[n]atively, it can also be possible for the change-over control device **711** to monitor the bandwidth of a transfer and on understepping or exceeding a certain bandwidth and/or in the event of a time delay when forwarding IP data packets to automatically release a control command to change over to the relevant other type of transfer.

'453 patent col. 9 ll. 36–42. Teles contends that this passage requires that the function include monitoring the bandwidth of the packet-switched network in connection with the transfer. But the fact that the specification describes monitoring bandwidth as an alternative possibility for producing a change-over command does not support construing that function to match the alternative function disclosed in the specification rather than the recitation in the claim.

When construing functional claims under § 112 ¶ 6, "[t]he statute does not permit limitation of a means-plus-function claim by adopting a function different from that

explicitly recited in the claim." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("[T]he district court erred . . . by incorporating unrecited functional limitations into the claims."); *see also Globetrotter Software, Inc. v. Elan Computer Grp.*, 236 F.3d 1363, 1367 (Fed. Cir. 2001) (The structure disclosed in the specification must be necessary to perform "the function described in the claim.") (citing *Micro Chem.*, 194 F.3d at 1258). Even if the passage in the specification relied on by Teles were relevant to construing the claim language, it does not support a different claim construction. The passage states that a control signal could be released automatically on "understepping or exceeding a certain bandwidth and/or in the event of a time delay when forwarding IP data packets." '453 patent col. 9 ll. 35–40. On its face, this language (using "and/or") describes two factors—bandwidth and time delay—as potential alternatives for producing a change-over command; it does not suggest that bandwidth monitoring is necessary to perform that function. The Board did not err in its claim construction.

Finally, Teles argues that the Board's claim construction is erroneous in light of its alleged inventive concept as defined by the inventor (monitoring the bandwidth of a particular transfer). Teles argues that "the Supreme Court's *Mayo* decision requires that the 'inventive concepts' embodied by the claimed invention be identified as part of construing claims." Reply Br. 5 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)). But the Court in *Mayo* referred to an "inventive concept" only in the context of § 101 patent-eligibility analysis, and specifically in the context of ensuring that a process "amounts to significantly more than a patent upon the natural law" which its steps invoke. *Mayo*, 132 S. Ct. at 1294. Requiring claims to recite an inventive concept does not mean that claims must be construed in light of unspecified inventive con-

cepts. *Mayo* simply does not speak to claim construction. The inventive concept aspect of its discussion has no bearing on claim construction.

## B. Obviousness

Obviousness is a question of law that we review de novo, but it rests upon factual determinations that we review for substantial evidence. *In re Baxter Int'l, Inc.*, 678 F.3d at 1361 (Fed. Cir. 2012) (citing *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)).

The Board upheld the examiner's rejection of claim 35 (as well as claims 34, 36 and 38) as obvious in view of White combined with either Jonas or Farese. White "relates to an Internet telephone service where calls can be made over the Internet from telephone to telephone, telephone to computer, or computer to telephone." J.A. 1411 (citing '890 patent col. 4 ll. 5–24). Farese relates to a technique for dynamically changing between packet and circuit switching in Integrated Services Digital Network (ISDN) communications. Jonas' system and method "enables data packets to be transmitted over a bypass [line]-switched telephone network between two computers connected to a public packet-switched network, such as the Internet." J.A. 1413 (citing '792 patent col. 1 ll. 8–12). Jonas further discloses that the bypass network could be used to avoid time delays associated with packet switching. The Board affirmed the examiner's finding that "'it was well known in the art to change over to [] line-switching or packet-switching during an existing transfer during a communication in response to a control signal,' as disclosed by Farese and Jonas." J.A. 1427.

Although White did not itself disclose changing between line-switched and packet-switched connections during an ongoing communication, the Board agreed with the examiner "that it would have been obvious to modify White to allow a change-over . . . during an existing transfer, as explicitly taught by Jonas and Farese." J.A.

1428. Moreover, this modification "would dynamically take advantage of both the inherent cost benefit of using the packet-switched Internet and the minimal time delay of [line]-switched telephone network." J.A. 1428. According to the examiner, this benefit explained "why one of ordinary skill in the art would combine the teachings of White and Jonas and Farese." J.A. 1429. With respect to claim 35, the Board agreed with the examiner that Jonas disclosed changing to a line-switched network when transmission delays are detected and thus "discloses 'producing a control signal automatically when the demands of quality are understepped or exceeded.'" J.A. 1435.

Teles challenges the conclusion of obviousness on the grounds that the prior art references do not disclose all of the recited limitations of claim 35. Teles' main objection is to Jonas, specifically, that it discloses a method of calculating transmission delay based on monitoring the entire network rather than an individual communication. But this argument assumes an overly limiting construction of the prior art reference and the language of claim 35. Under the Board's construction, the change-over control device of claim 35 must produce a signal automatically, which requires monitoring quality factors, such as delay, but there is no reason to require monitoring the bandwidth of a single transfer in isolation from the network.

Additionally, the Board found that Jonas teaches that transmission delay may be detected "using a variety of measures known to those skilled in the art, including topological delay time for the transmission, cost, or the number of gateways through which the network path traverses" as well as by "monitor[ing] the delay time . . . by sending occasional 'ping' messages to the destination router . . . and monitoring delay times of any response packets." J.A. 14–17 (citing '792 patent col. 5 l. 53 to col. 6 l. 3). We find no reason to overturn the Board's finding that Jonas discloses the limitation of claim 35.

Teles next argues a person of ordinary skill would not have found it obvious, or even possible, to combine White with Jonas. Teles asserts that incorporating Jonas' "free-standing" switches into White's switches, the central offices of local exchange carriers, would be "an extremely complicated process." Reply Br. 25. The Board cited the examiner's reasons for rejecting Teles' argument: "White is proposing providing a redesigned network [for] handling Internet based call[s] . . . [and] already anticipates redesigning the Central Office equipment to respond to Internet type calls, thus Jonas would clearly be envisioned in this network redesigned by White." J.A. 1304. This finding directly contradicts Teles' assertion that White on its own requires "no change of its switching apparatus," Reply Br. 26, and instead shows that White presumes that modifications would be required.

The Board did not err in rejecting claim 35 of the '453 patent as obvious in view of White and Jonas.

**AFFIRMED**